**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RICHARD H. MCCULLOUGH and** | ) | |
| **HOLLY A. MCCULLOUGH,** | ) | |
| | ) | **No. 08cv1123** |
| **Plaintiffs,** | ) | **Hon. Arthur J. Schwab** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **ZIMMER, INC., ZIMMER HOLDINGS, INC.,** | ) | |
| **DUPUY ORTHOPEDICS, INC., SMITH AND** | ) | |
| **NEPHEW, INC., BIOMET, INC., STRYKER** | ) | |
| **ORTHOPEDICS, INC., and STRYKER, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION**

## I.    INTRODUCTION

This case involves allegations of various violations of the antitrust laws, Racketeer

Influenced and Corrupt Organizations Act ("RICO"), and state law claims of tortious interference

with contract and civil conspiracy brought by Richard H. McCullough and Holly A. McCullough

(collectively "Plaintiffs") against seven entities that manufacture and sell orthopedic devices.

These entities include Zimmer, Inc., Zimmer Holdings, Inc., DuPuy Orthopedics, Inc., Smith and

Newphew, Inc., Stryker Orthopedics, Inc., and Stryker, Inc. (collectively "Defendants").[1]  Before

this Court are Defendants' Renewed Motions to Dismiss pursuant to Rule 12(b)(6) of the Federal

Rules of Civil Procedure on the grounds that Plaintiffs have failed to state a claim upon which

relief may be granted.  Doc. nos. 95-99.  For the following reasons, Defendants' Motions to

Dismiss are **GRANTED**.

---

[1] On March 2, 2009, all parties participated in a mediation session before Wendelynne J. Newton.  Upon conclusion of the mediation, Defendants DePuy Orthopedics, Inc., Biomet, Inc., and Smith & Nephew, Inc. entered into a settlement agreement with Plaintiffs. *See* doc. no. 115.

## II.     FACTUAL BACKGROUND

From 1988 to the present, Plaintiffs have engaged in the sale, service, and manufacture of orthopedic products such as implants, sports medicine and trauma products, and other various surgical instruments and medical supplies. *See* Amended Complaint, doc. no. 88 at ¶ 14. According to Plaintiffs, their territory ranged from the western half of Pennsylvania to the eastern half of Ohio and West Virginia. *Id.* Plaintiffs allege that they are direct competitors with each Defendant. *Id.* at ¶ 17. Plaintiffs' business required the purchase of these items from a variety of manufacturers for demonstration purposes and direct sale to hospitals and physicians. *Id.* at ¶ 15. Plaintiffs also purchased instrument sets which they in turn rented out to hospitals for various surgical and other medical procedures. *Id.* at ¶ 16.

From 1988 to 1992, Plaintiffs, doing business as Intermedics-McCullough, allegedly sold, serviced, and manufactured medical supplies, although not exclusively, as an independent contractor for Sulzer-Medica, Inc. ("Sulzer"). *Id.* at ¶ 18. Sulzer manufactured replacement hip joints, knees, shoulder implants, and various other orthopedic products. *Id.* Outside of Sulzer, Plaintiffs claim they bought, sold, and serviced orthopedic, trauma, and sports medicine products by several other companies. *Id.* at ¶ 25.[2]

The McCulloughs aver that contracts with these various companies provided for the exclusive right to sell and service each company's products in the western half of Pennsylvania and West Virginia. *Id.* at ¶ 19. They maintain that development of a customer base required

---

[2] These companies include Exegen, Inc. and Orthologic, Inc., bone growth stimulator manufacturers Alphatec, Inc., and Ace, Inc., trauma supply manufacturer Innovasive, Inc., and sports medicine product manufacturers Bregg Bracing and Generation 2 bracing. Doc. no. 88 at ¶ 25.

close, ongoing relationships with hospitals and orthopedic surgeons who, in turn, encouraged the use of their products by orthopedic interns, residents, and fellows. *Id.* at ¶ 21. Plaintiffs' primary customers included the University of Pittsburgh Medical Center ("UPMC") Health system, West Penn Health system, Allegheny General Hospital, Butler Memorial Hospital, and various independent hospitals. *Id.* at ¶ 22.

From 1992 through 2001, the McCulloughs assigned their interests in Intermedics-McCullough to Cutting Edge Orthopedics, Inc. ("CEO"), a Pennsylvania corporation in which the McCulloughs own all shares of stock. *Id.* at ¶ 24. From 1992-1996, CEO's business allegedly grew to approximately five million dollars per year in sales while actively competing with all Defendants. *Id.* at ¶ 27. Plaintiffs then claim that after 1996, numerous physicians, hospitals, and health care systems in CEO's region declined to consider purchasing its products, giving exclusive consideration to Defendants' products, which in turn caused CEO to lose profits, market share, and product lines. *Id.* at ¶¶ 29-30.

According to Plaintiffs, during 2007, as a result of the disclosure of a criminal investigation conducted by the United States Department of Justice and the United States Department of Health, they discovered that Defendants engaged in allegedly illegal activities, including violations of the federal anti-kickback statute and the federal False Claims Act. *Id.* at ¶ 31. Plaintiffs contend that Defendants' purpose was to deprive them and other competitors in the orthopedic and surgical product industry the opportunity to compete and do business with physicians, hospitals, and other medical institutions. Further, subsequent to 2001, Defendants' activities allegedly denied Plaintiffs access to most of the orthopedic replacement product market in their territory. *Id.* at ¶ 32.

Defendants control ninety-five (95) percent of the hip, knee, and joint replacement product business in the United States. *Id.* at ¶ 33; *see also* United States Attorney, District of New Jersey Press Release, Feb. 27, 2007, *available at* http://www.usdoj.gov/usao/nj/press/files/ pdffiles/hips0927.rel.pdf. According to Plaintiffs, each Defendant paid illegal kickbacks and provided other forms of illegal payments to physicians, hospitals, health systems, and their related entities for the purpose of gaining exclusive access to the replacement hip, knee, and joint industry. Doc. no. 88 at ¶ 36.

The United States Department of Justice concluded that "[t]he financial inducements in the form of consulting agreements were entered into with hundreds of surgeons throughout the 2002-2006 time frame. The investigation revealed instances in which physicians did little to no work for the financial inducements but did agree to exclusively use the paying company's products." *Id.* at ¶ 39, *quoting* United States Attorney, District of New Jersey Press Release, Feb. 27, 2007, *available at* http://www.usdoj.gov/usao/nj/press/files/ pdffiles/hips0927.rel.pdf. As part of settling the investigation, each Defendant entered into a "Deferred Prosecution Agreement" with the United States Attorney for the District of New Jersey, agreed to monitor all payments to physicians, hospitals, and health institutions, and agreed to collectively pay a sum of three hundred eleven million dollars ($311,000,000) in fines. Doc. no. 88 at ¶ 41.

Plaintiffs set forth in detail the payments Defendants allegedly made both nationally and locally to physicians, hospitals, and other medical institutions. *See id.* at ¶¶ 44-50. Plaintiffs characterize Defendants' payments as illegal and made for the purpose of inducing these various physicians, hospitals, and medical institutions to use their products over those of the Plaintiff.

*Id.* at ¶ 51.[3]

Plaintiffs aver that, starting in 1995, Plaintiffs thoroughly investigated why medical personnel and institutions stopped purchasing their products and services, yet Defendants actively concealed and refused to disclose the existence or extent of these allegedly illegal payments, referring to them as "consulting fees," "royalty payments," or "gifts" when necessary. *Id.* at ¶ 53. According to Plaintiffs, Defendant characterized the payments as such with the intent to deceive investigators such as the McCulloughs and other regulatory agencies. *Id.*

III.    **PROCEDURAL HISTORY**

Plaintiffs commenced this action on March 8, 2008, with filing of their Complaint. Doc. no. 1. Because Plaintiffs' case involves a claim under RICO, the Court, on November 12, 2008, ordered Plaintiffs to file a RICO case statement. Doc. no. 57. On November 14, 2008, each Defendant filed a Motion to Dismiss Plaintiffs' Complaint, as well as a joint Brief in Support of their motions. Doc. nos. 61, 63-64, 66-67, 69. On November 25, 2008, Plaintiffs filed their RICO Case Statement. Doc. no. 74. On December 1, 2008, Plaintiffs filed a Brief in Opposition to Defendants' Motions to Dismiss their Complaint. Doc. no. 75. Defendants filed their Joint Reply to Plaintiffs' Response on December 4, 2008. Doc. no. 77.

A case management conference was held on December 8, 2008. During this conference, the Court heard oral argument regarding Defendants' pending motions to dismiss Plaintiffs' original Complaint. Doc. nos. 61, 63, 64, 66, and 67. Upon consideration of the arguments, the

---

[3] Defendants Stryker Orthopedics, Inc., and Stryker, Inc., note in their Response to Plaintiffs' Motion for Oral Argument and Settlement Conference that they entered into a Non-Prosecution Agreement with the United States Attorney's Office, that no criminal charges were filed, and that they were not required to pay a fine. *See* doc. no. 117 at 2.

Court granted these initial motions to dismiss, and gave Plaintiffs leave to amend their Complaint by January 5, 2009. *See* Case Management Order, doc. no. 78.

On January 5, 2009, Plaintiffs filed their Amended Complaint. Doc. no. 88. On January 20, 2009, each Defendant filed a Motion to Dismiss Plaintiffs' Amended Complaint, (doc. nos. 95-99), and a Joint Brief in Support of the each Motion to Dismiss. Doc. no. 100. On February 5, 2009, Plaintiffs filed their Brief in Opposition to Defendants' Motion to Dismiss. Doc. no. 103. On February 18, 2009, Defendants filed their Joint Reply to Plaintiffs' Response. Doc. no. 109. The issues have now been fully briefed and are ripe for disposition.

## IV. LEGAL STANDARD

In light of the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 550 U.S.544 (2007), a complaint may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008)(quoting *Twombly*, 550 U.S. at 570). While *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), allowed dismissal of a claim only if "no set of facts" could support it, under *Twombly,* a claim for relief under Rule 12(b)(6) now "requires more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. In order to satisfy the requirement of Fed. R. Civ. P. 8(a)(2) that a plaintiff include a "short and plain statement of the claim showing that the pleader is entitled to relief," a plaintiff must aver sufficient factual allegations in order "to raise a right to relief above the speculative level." *Ayers v. Osram Slyvania, Inc.*, Civil Action No. 07-1780, 2008 U.S. Dist. LEXIS 72644, at *6 (M.D. Pa. Sept. 24, 2008)(citing *Twombly*, 550 U.S. at 555).

6

In considering a Rule 12(b)(6) motion, a court accepts all of the plaintiff's allegations as true and construes all inferences in the light most favorable to the non-moving party. *Umland v. Planco Fin. Servs.*, 542 F.3d 59, 64 (3d Cir. 2008)(citing *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006)). However, a court will not accept bald assertions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. *See In re Rockefeller Ctr. Props., Inc. Sec. Litig.,* 311 F.3d 198, 215 (3d Cir. 2002); *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 n. 8 (3d Cir. 1997). A court is not required to consider legal conclusions; rather, it should determine whether the plaintiff should be permitted to offer evidence in support of the allegations. *Maio v. Aetna*, 221 F.3d 472, 482 (3d Cir. 2000). The failure-to-state-a-claim standard of Rule 12(b)(6) seeks to promote judicial economy by eliminating unwarranted discovery and factfinding. *United States ex. rel. Repko v. Guthrie Clinic, P.C.*, 557 F.Supp.2d 522, 525 (M.D. Pa. 2008). Therefore, a plaintiff must put forth sufficient facts that, when taken as true, suggest the required elements of a particular legal theory. *See Wilkerson v. New Media Tech. Charter Sch.,* Inc., 522 F.3d 315 (3d Cir. 2008) (citing *Phillips*, 515 F.3d at 224). Generally, this does not impose a heightened burden on the claimant above that already required by Rule 8, but instead calls for fair notice of the factual basis of a claim while "rais[ing] a reasonable expectation that discovery will reveal evidence of the necessary element." *Weaver v. UPMC*, Civil Action No. 08-411, 2008 U.S. Dist. LEXIS 57988, at * 7 (W.D. Pa. July 30, 2008)(citing *Phillips*, 515 F.3d at 234; and *Twombly*, 550 U.S.. at 555).

## V. DISCUSSION

Defendants contend that Plaintiffs' claims under the Sherman Act, 15 U.S.C. § 1, and Robinson-Patman Act, 15 U.S.C. § 13, lack merit and that Plaintiffs lack antitrust standing

because they are merely commissioned sales representatives rather than competitors or consumers. *See* doc. no. 100 at 3-10. Plaintiffs counter that the allegations in their Amended Complaint are sufficient to state a claim under both Section 1 of the Sherman Act and Section 2(c) of the Robinson-Patman Act. *See* doc. no. 103 at 7-14. Further, Plaintiffs argue extensively that, as they are direct competitors of each Defendant and also consumers of orthopedic and other medical supplies, they have suffered an antitrust injury and have standing to bring their antitrust claims. *See id.* at 14-27. As the standing issue may be dispositive, it will be discussed first.

### A.   Antitrust Standing

In the present case, Defendant contends that Plaintiffs were commissioned salespeople for larger distributors of medical supplies, and as such, lack standing to bring an antitrust suit because they have failed to allege an antitrust injury. Doc. no. 100 at 7. Specifically, Defendants argue that the McCulloughs lack standing because they are "neither a competitor nor a consumer in the relevant market" and instead are simply an "intermediary" through which a larger manufacturer distributes its product. *Id.* Plaintiffs counter that they were more than commission-based salespeople because their own companies bought products directly from the manufacturers and then sold them directly to hospitals and physicians and provided service for those same products. Doc. no. 103 at 17-20. For the following reasons, the Court agrees with Defendant that Plaintiffs lack standing because they are not the proper parties to bring this antitrust action and have not suffered an antitrust injury.

In *Associated Gen. Contractors of Calif. v. Calif. State Council of Carpenters*, 459 U.S. 519, 537-545 (1983), the Supreme Court outlined the five factors to consider when determining whether a party has standing to bring an antitrust claim:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause the harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal applications of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.[4]

*City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 254, 264 (3d Cir. 1998)(citing *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 181 (3d Cir. 1997)). The United States Court of Appeals for the Third Circuit has instructed that a district court should first address the issue of whether the plaintiff suffered an antitrust injury, for if there is no antitrust injury present, no further inquiry is required. *City of Pittsburgh*, 147 F.3d at 265. This determination depends in part on the source of the alleged harm; in other words, whether the injury flows from that which makes the defined acts unlawful. *Id.*

Antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). To answer whether the injury flowed from that which makes the defined acts unlawful, it is necessary to examine the causal connection between the purportedly unlawful conduct and the alleged injury.

---

[4] Prior cases of the United States Court of Appeals for the Third Circuit also discuss antitrust standing as a two-factor test: "To establish antitrust standing, the plaintiff must show both: (1) harm of the type antitrust laws were intended to prevent, and (2) an injury to the plaintiff which flows from that which makes defendants' acts unlawful." *See Steamfitters Local Union No. 420 Welfare Fund v. Phillip Morris*, 171 F.3d 912, 924 n.6 (3d Cir. 1999) (quoting *Gulfstream III Assocs. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 429 (3d Cir. 1994)).

Generally, the plaintiff seeking relief under the antitrust laws must be either a competitor or consumer of the defendant. *See Barton & Pittinos*, 118 F.3d at 182-85.[5] Advertisers or brokers of a particular product who are merely commissioned salespeople for a larger wholesaler or manufacturer have been held to be non-competitors of other wholesalers or manufacturers who sell the same types of products in the same relevant market. *See id.* at 185; *see also Gregory Mktg. Corp. v. Wakefern Food Corp.*, 787 F.2d 92, 95 (3d Cir. 1986)(finding that a broker for apple juice products selling on the behalf of an apple juice manufacturer was neither a consumer nor competitor in the apple juice market); *A.D.M. Club Mgmt. Sys. v. Gary Jonas Computing, Ltd.*, Civ. A. No. 05-3943, 2006 U.S. Dist. LEXIS 66904, at *14-16 (E.D. Pa., Sept. 18, 2006)(holding that an "authorized representative" of a company does not compete with that company in the open market).

In certain antitrust suits, even where a plaintiff is not a competitor or consumer in the relevant market, that plaintiff may still establish an antitrust injury when the harm is "inextricably intertwined" with the defendant's wrongdoing. *See Carpet Group Int'l v. Oriental*

---

[5] The *Barton & Pittinos* case involved a company involved in the distribution chain of a version of the hepatitis-B vaccine. The plaintiff, Barton & Pittinos ("B&P"), entered into a contract with SmithKlineBeechum ("SKB") to market its version of the hepatitis-b vaccine to nursing homes. B&P would then pass orders to General Injectables and Vaccines, Inc. ("GIV"), which would buy the vaccine from SKB and sell it to nursing homes, with B&P receiving a commission. This arrangement upset a group of pharmacists who were in the business of consulting with nursing homes about the hepatitis-b vaccine. These pharmacists claimed that SKP's program bypassed and undercut them on the price. SKP terminated the program.

B&P brought suit alleging SKP conspired with the pharmacists to restrain competition for the vaccine in the nursing home market. However, the district court held, and the United States Court of Appeals for the Third Circuit agreed, that B&P was not a competitor or a consumer of the vaccines in the relevant market. It simply marketed the vaccine to nursing homes and took their orders and took no part in their distribution. SBK was the manufacturer and GIV was the distributor. B&P alone was not a competitor. *Barton & Pittinos*, 118 F.3d at 178-85.

10

*Rug Importers Ass'n,* 227 F.3d 62, 77 (3d Cir. 2000); *Steamfitters Local Union No. 420 Welfare Fund v. Phillip Morris, Inc.*, 171 F.3d 912, 926 (3d Cir. 1999); *Chemi SpA v. Glaxosmithkline*, 356 F. Supp. 2d 495 (E.D. Pa. 2005). For example, in the *Carpet Group Int'l* case, the United States Court of Appeals for the Third Circuit found that because the plaintiff "endeavored to forge a link in a chain of the sale" of oriental rugs between foreign rug manufacturers and domestic rug retailers, she competed with the rug importers for business. *Carpet Group Int'l*, 227 F.3d at 77. In the *Chemi SpA* case, the plaintiff, a supplier of the drug nabumetone, learned that it could produce the drug commercially and sell it to vendors on its own. *Chemi SpA*, 356 F. Supp. 2d at 502. The defendant attempted to prevent plaintiff from selling nabumetone to vendors by bringing a bogus patent infringement action. *Id.* While they were not direct competitors, the United States District Court for the Eastern District of Pennsylvania found that the plaintiff's injury was "inextricably intertwined" with the injury the defendant sought to inflict on the nabumetone market. *Id.*

### 1. Plaintiffs are Commissioned Sales Representatives

In the present action, Plaintiffs' business activities resemble those of the plaintiffs described in the *Gregory Mktg. Corp.* and *A.D.M. Club Mgmt. Sys.* cases rather than the *Carpet Group Int'l* or *Chemi SpA* cases. Based on the allegations in the First Amended Complaint, Plaintiffs are nothing more than distributors, or intermediaries through which larger orthopedic supply manufacturers such as Sulzer distributed their products. As Defendants state in their Brief in Support of their motions to dismiss, Plaintiffs' primary business activities were "especially" focused on serving as a representative for Sulzer. Doc. no. 88 at ¶ 18; doc. no. 100 at 7-8. Plaintiffs also had similar contracts with "numerous companies" to sell and service each

11

company's products in Western Pennsylvania.  Doc. no. 88 at ¶ 19.  These companies included

"Exegen, Inc. and Orthologic, Inc., manufacturers of bone-growth stimulators, Alphatec, Inc. and

Ace, Inc., manufacturers of trauma supplies, Innovasive, Inc., a manufacturer of sports medicine

products, and Bregg Bracing and Generation 2 bracing, manufacturers of orthotic braces."  *Id.* at

¶ 25.  In their Brief in Opposition, Plaintiffs mention that when the Sulzer contract ended in

2001, they represented a company called Encore Orthopedics ("Encore"), a fact not mentioned in

their Amended Complaint.  Doc. no. 103 at 17.

Further, Plaintiffs received the bulk of their revenues from "contractually negotiated

shares of the gross sale of products and services."  Doc. no. 88 at ¶ 70.  In other words, Plaintiffs

received commissions.  *Compare* doc. no. 88 at ¶ 70 *and* doc. no. 1 at ¶ 50.  Plaintiffs argue that

they are not commissioned sales representatives in the "traditional sense" because they were paid

directly by hospitals and physicians to assist surgeons in the use of the surgical tools they sold

along with the orthopedic devices.  Doc. no. 103 at 17.  However, examining the allegations in

the Amended Complaint as a whole, Plaintiffs' business model follows this pattern: they are

commissioned by larger manufacturers of orthopedic and other medical supplies such as Sulzer,

Encore, or any of the other companies listed in the Amended Complaint, assigned a specific

territory, and then act as authorized sales representatives for these larger manufacturers within

this territory.  *See* doc. no. 88 at ¶¶ 14-25.

Here, the standing analysis will focus on the connection between the Plaintiffs' alleged

injuries and the harm, if any, Defendants sought to inflict on the orthopedic medical supply

market.  Plaintiffs are similarly situated to the plaintiffs in the *Gregory Mktg* and in *A.D.M. Club

Mgmt. Sys.* cases in that Plaintiffs here are simply the intermediary through which companies

such as Sulzer and Encore distributed their products. *See A.D.M. Club Mgmt. Sys.*, 2006 WL 2689400 at *5. In both cases, the plaintiff-distributor's injuries resulted from the termination of their distribution contracts, and for that reason each court found that the plaintiffs lacked antitrust standing. *Gregory Mktg*, 787 F.2d at 95; *A.D.M. Club Mgmt. Sys.*, 2006 WL 2689400 at *5-6.

In a similar case, the United States District Court for the Eastern District of Pennsylvania granted the defendant's motion to dismiss based on a finding that the plaintiff-distributor's injuries resulted from defendant-manufacturer's termination of distribution contracts following the defendant's acquisition of the plaintiffs' suppliers. *See Precision Surgical, Inc. v. Tyco Int'l, Ltd.*, 111 F. Supp. 2d 586, 590 (E.D. Pa. 2000). Essentially, the plaintiffs' injury in this case was incidental to, and not the very result of, the antitrust violation. *Id.*; *see also Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 12 (1st Cir. 1999)(holding that the terminated distributor plaintiff lacked standing because the alleged injury was incidental to, and not the very means of, the antitrust violation). Plaintiffs herein are the authorized representatives of Defendants' competitors, not competitors themselves, despite their allegations to the contrary. Thus, Plaintiffs were participants, not competitors, in the relevant market of the manufacture and sale of orthopedic and other medical supplies.

## 2. Plaintiffs have not been Injured as Consumers in the Relevant Market

Plaintiffs' attempt to characterize themselves as consumers, alleging that their business requires them to purchase orthopedic implants, sports medicine and trauma products, surgical instruments, and medical supplies from a variety of manufacturers for demonstration purposes. Doc. no. 88 at ¶¶ 15, 64. Further, Plaintiffs claim that the products they bought and sold were "less expensive" and "superior" to Defendants' products. However, any injury caused by a

13

resultant price increase and decrease in quality would be felt by the end-users of the orthopedic products, namely the hospitals, physicians, and patients themselves. *See Precision Surgical*, 111 F. Supp. 2d at 590. Therefore, any increase in price or decrease in quality is not an injury to Plaintiffs' business or property.

### 3. Plaintiffs are not Manufacturers

Plaintiffs, in an attempt to show that they are competitors, have also added a bare allegation that they manufactured some of the products they sold. *Compare* doc. no. 88 at ¶ 14 *and* doc. no. 1 at ¶ 13. Plaintiffs simply added the word "manufacturer" to their pleadings without reference to any name or type of product they have manufactured. Given the factual allegations in the Amended Complaint that primarily discuss their sales activities, coupled with the noticeable lack of the term "manufacturer" in the original Complaint, nothing within either document supports the inference that Plaintiffs are manufacturers of orthopedic and other medical supplies and are in that way competitors of Defendants.

### 4. Plaintiffs' Injury is not Inextricably Intertwined with Defendants' Conduct

Although Plaintiffs are neither competitors nor consumers in the relevant market, there are certain situations where such a plaintiff may still establish standing if her injury is "inextricably intertwined" with the defendant's anticompetitive conduct. *See Carpet Group Int'l*, 227 F.3d at 77. Whatever injury Plaintiff suffered is not inextricably intertwined with Defendants' allegedly illegal conduct. Plaintiffs' primary losses purportedly arose after Defendants acquired Sulzer, ending Plaintiffs' distribution contract with that company. Plaintiffs acquired other distribution contracts, such as the one with Encore, yet none were as successful.

The present case is distinguishable from cases such as the *Carpet Group Int'l* and *Chemi SpA* cases. In the *Carpet Group Int'l* case, the defendant rug importers directed their boycott directly at plaintiff's trade shows with the intent of squeezing her and her business out of the oriental rug market. *Carpet Group Int'l*, 227 F.3d at 77. In the *Chemi SpA* case, the defendant filed a bogus patent infringement suit directly against the plaintiff upon discovering the plaintiff's efforts to enter into the nabumetone manufacturing market. *Chemi SpA*, 356 F. Supp. 2d at 502.

Here, Defendants did not engage in payment agreements (detailed thoroughly by Plaintiffs in the Amended Complaint at ¶¶ 37-51) with the sole aim of keeping Plaintiffs out of the relevant market. Since Defendants conducted their alleged scheme on a national level, there are more direct competitors, such as Sulzer or Encore, that may have been harmed by the scheme's effects on the market. Therefore, Plaintiffs' losses as distributors of orthopedic supplies are, if anything, merely incidental to any alleged anticompetitive conduct of Defendants. *See, e.g., U.S. Horticultural Supply, Inc. v. Scotts Co.*, Civ. A. No. 03-773, 2004 U.S. Dist. LEXIS 11859, *13-17 (E.D. Pa. Feb. 18, 2004)(distinguishing between cases where the plaintiff's injury is inextricably intertwined with the defendant's anticompetitive conduct and cases where the injury to the plaintiff was incidental to defendant's conduct).

### 5. Other Antitrust Standing Factors Weigh Against Plaintiffs

#### a. Plaintiffs' Injuries are Indirect

As Plaintiffs are not direct competitors of Defendants, but rather authorized representatives of Defendants' competitors, their injury is not a direct result of Defendants' allegedly illegal conduct. Defendants have not engaged in a concerted effort to squeeze Plaintiffs

out of the market.  Defendants did make an effort to win contracts over their competitors, and as a result of this effort, Plaintiffs lost a major distributorship contract.  Thus Plaintiffs' reliance on *Environmental Tectonics v. W.S. Kirkpatrick, Inc.*, 847 F.2d 1052, 1067 (3d Cir. 1988), and *Angelico v. Lehigh Valley Hosp., Inc.*, 184 F.3d 268, 275 (3d Cir. 1999) is inapposite.  In *Environmental Tectonics*, the plaintiff directly competed with other contractors for projects from the Nigerian government and was shut out due to its competitors' commercial bribery scheme.  *Environmental Tectonics*, 847 F.3d at 1067.  In the *Angelico* case, the plaintiff was the direct target of the defendants' conspiracy to prevent him from practicing surgery in the relevant market.  *Angelico*, 184 F.3d at 275.  Here, Plaintiffs' alleged injuries only indirectly resulted from Defendants' procuring exclusive dealing agreements with the hospitals and physicians in the relevant territory.  Therefore, Plaintiffs do not satisfy the direct injury requirement of antitrust standing.

### b. Plaintiff is not the Only Direct Victim

Also, Plaintiffs contend that there are no more direct victims of Defendants' allegedly illegal conduct.  *See* doc. no. 103 at 23.  However, in an attempt to allege harm to the competitive process, they undercut that argument by alleging that Defendants' engaged in "illegal and anticompetitive activities with the purpose of depriving the McCulloughs and *other unnamed competitors* of the opportunity to compete."  Doc. no. 88 at ¶ 31(emphasis added).  If other competitors, such as Sulzer, Encore, or any other entity were harmed by Defendants' conduct, then they would also be direct victims.  The cases Plaintiffs rely on say as much.  *See Transmission Sys., LLC v. Kershner*, 536 F. Supp. 2d 543, 559 (E.D. Pa. 2008) (vendors prevented from selling goods to franchisees because of a refusal to participate in an alleged

kickback scheme are direct victims of the antitrust conduct); *Chemi SpA*, 356 F. Supp. 2d at 502

(holding plaintiff is direct victim where plaintiff was prevented from selling product to customers

because of anticompetitive conduct). Therefore, Plaintiff has failed to satisfy the singular direct

victim requirement of antitrust standing.

c. More Direct Victims Mean a Greater Likelihood of Duplicative
Recovery and Complex Apportionment of Damages

Additionally, more direct victims means an increased possibility of duplicative recovery.

Plaintiff, therefore, also fails to satisfy the duplicative recovery and complex apportionment of

damages element of antitrust standing. As Plaintiffs' injury is not unique due to the existence of

more direct victims of Defendants' conduct, there is a greater risk of duplicative recovery or

complex apportionment of damages among victims. *See 2660 Woodley Rd. Joint Venture v. ITT

Sheraton Corp.*, 369 F.3d 732, 741-42 (3d Cir. 2004) ("[T]here are clearly more direct victims of

Sheraton's alleged commercial bribery scheme. Vendors who may have been prevented from

selling goods to Hancock because they refused to participate in the SPR program of surcharges

and rebates are far more direct victims of Sheraton's scheme than Hancock"); *cf. Chemi SpA*, 356

F. Supp. 2d at 502-503 (determining that because the plaintiff suffered a unique injury and was

the only intended victim of the defendant's conduct, there is little risk of duplicative recovery or

complex apportionment of damages).

6. Conclusion

Overall, Plaintiffs' antitrust allegations do not state a claim that is "plausible on its face."

*Phillips*, 515 F.3d at 234 (3d Cir. 2008)(quoting *Twombly*, 550 U.S. at 570). Plaintiffs have

attempted to buttress their original complaint with mere conclusions that do not raise their right

17

to relief above a "speculative level."  *Ayers v. Osram Slyvania, Inc.*, 2008 U.S. Dist. LEXIS 72644, at *6 (M.D. Pa. Sept. 24, 2008) (citing *Twombly*, 550 U.S. at 555).  Mere conclusory statements that Plaintiffs "directly competed," doc. no. 88 at ¶ 17, with Defendants or were "consumers and producers" *Id.* at ¶ 64 or "manufacturers" *Id.* at ¶ 14 of orthopedic and medical supplies, without more, are not sufficient to establish the necessary elements for antitrust standing.

Plaintiffs, in their Brief in Opposition, fail to acknowledge the *Twombly* standard.  Not only did the United States Court of Appeals for the Third Circuit adopt the *Twombly* standard in *Phillips* and state that it applies to all motions to dismiss pursuant to Rule 12(b)(6), *Twombly* itself was decided in the antitrust context.  While Plaintiffs correctly state they are not held to an "elevated" pleading standard, they must include sufficient factual allegations that "raise a right to relief above the speculative level."  *See Behrend v. Comcast Corp.*, 532 F. Supp. 2d 735, 738 (E.D. Pa. 2007) (quoting *Twombly*, 550 U.S. at 555).  Plaintiffs have failed to do so here with regards to the necessary elements of antitrust standing.

For the foregoing reasons, Defendants' Motions to Dismiss Plaintiffs' antitrust claims pursuant to Federal Rule of Civil Procedure 12(b)(6) are **GRANTED**.

### B.    Antitrust Violations

Since Plaintiffs' have failed to establish the threshold antitrust standing requirement, the Court will only briefly discuss Plaintiffs' claims under the Sherman Act and the Robinson-Patman Act.

<u>1. Sherman Act Claim</u>

Plaintiffs' Amended Complaint suffers pleading deficiencies in its Sherman Act claim. A claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, requires the following showing from a plaintiff: 1) concerted action on the part of the defendants; 2) that produced anti-competitive effects within the relevant product and geographic markets; 3) that the concerted actions were illegal; and 4) that he was injured as a proximate result of the concerted action. *Untracht v. Fikiri*, 454 F. Supp. 2d 289, 311 (W.D. Pa. 2006).

The essence of a Section 1 claim is the existence of an agreement. *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005). There must be a "unity of purpose or a common design and understanding or a meeting of the minds in an unlawful arrangement." *Id.* Here, Plaintiffs have not alleged that Defendants acted in concert, creating either horizontal agreements or improper vertical agreements.

Further, as Defendant argues, Plaintiffs have not pled anticompetitive effects on the relevant market. Plaintiffs must, but do not, "allege . . . harm, not just to a single competitor, but to the competitive process." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998). Plaintiffs make vague references to "unnamed competitors," doc. no. 88 at ¶ 31, and bald assertions that the hospitals and physicians are paying more money for inferior products. *Id.* at ¶ 51. However, those hospitals and physicians appear to have freely contracted to buy their supplies from Defendants at a given price. Plaintiffs do not allege how Defendants' agreements harmed the competitive process outside of harming the Plaintiffs. "[T]he mere fact that one prospective supplier may lose business because of vertical dealings between the buyer and another vendor does not itself establish a public injury to competition." *Advanced Power Sys., Inc. v. Hi-Tech*

*Sys., Inc.*, 801 F. Supp. 1450, 1463 (E.D. Pa. 1992).

Plaintiffs' definition of the relevant geographic and product market is also vague. It appears that, geographically, Plaintiffs' market encompasses the western half of Pennsylvania and stretches into Ohio and West Virginia. Regarding the product market, a plaintiff should ground its allegations with references to the rule of reasonable interchangeability and cross-elasticity of demand. *Bldg. Materials Corp. of Am. v. Rotter*, 535 F. Supp. 2d 518, 525 (E.D. Pa. 2008) (citations omitted) (dismissing a plaintiff's Section 1 claim for failure to provide any factual basis or analysis to support the assertion that the relevant market is asphalt shingle roof ridge vents).

Here, Plaintiffs mentions orthopedic products in general, knee replacements, hip replacements, joint replacements, trauma products in general, sports medicine products in general, and bone growth stimulators. Like the plaintiff in *Bldg. Materials*, Plaintiffs herein do not explain with any sort of specificity the market for each product mentioned, such as the type of products they sell versus the type of products Defendants sell. Plaintiffs define the relevant product market without reference to the rule of reasonable interchangeability and cross-elasticity of demand. *See id.*

For the above reasons, Plaintiffs' Amended Complaint fails to allege the essential elements of a Sherman Act claim.

### 2. Robinson-Patman Act Claim

As for Plaintiffs' Robinson-Patman Act claim, Plaintiffs fail to allege the essential elements of a commercial bribery claim under Section 2(c) of the act, 15 U.S.C. § 13(c), and fail the basic requirement of Federal Rule of Civil Procedure (8)(a)(2) to put the Defendants on

notice as to what they are defending against. *See Phillips*, 515 F.3d at 234 (noting that a pleading should show that "the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.")(quoting *Twombly*, 550 U.S. at 555). First, while providing great detail of the payment scheme enacted by Defendants, Plaintiffs do not characterize this conduct as "commercial bribery" in the body of the complaint. Second, the paragraphs under the heading "Robinson-Patman Act" do not reference Section 2(c) of the Act, but instead discuss price discrimination under Section 2(a), a claim Plaintiffs do not defend in their Brief in Opposition. *See* doc. no. 88 at ¶¶ 92-95; doc. no. 103 at 12-14. Defendants' defend against a Section 2(a) price discrimination claim in their opening brief only to find that they must defend a Section 2(c) commercial bribery claim instead. Therefore, Plaintiffs' Amended Complaint does not set forth the necessary elements of a Robinson-Patman Act claim.

## C. RICO

Defendants contend that Plaintiffs' RICO claim, pursuant to 18 U.S.C. § 1962(c), should be dismissed because Plaintiffs fail to properly allege two essential elements of such a RICO claim: an enterprise and racketeering activity. Plaintiffs counter that they have properly alleged that the Defendants, physicians, hospitals, and other medical institutions constituted an enterprise and that Defendants engaged in predicate acts that constitute racketeering activity. For the following reasons, the Court agrees with Defendants that Plaintiffs' RICO allegations are insufficient to state a RICO claim.

The RICO statute provides the following:

> It shall be unlawful for any person employed or associated with any
> enterprise engaged in, or the activities of which affect, interstate or
> foreign commerce, to conduct or participate, directly or indirectly,

> in the conduct of such enterprise's affairs through a pattern of
> racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). A RICO claim requires four basic elements: (1) conduct; (2) of an

enterprise; (3) through a pattern; (4) of racketeering activity. *Lum v. Bank of Am.*, 361 F.3d 217,

223 (3d Cir. 2004).

### 1. Plaintiffs' Allegations of Enterprise are Insufficient

A "crucial" RICO element is the "enterprise." *McClure Enters., Inc. v. Fellerman*, Civ.

A. No. 06-353, 2007 WL 1455893, at * 3 (M.D. Pa. May 15, 2007). By statute an enterprise may

be: (1) a legal entity, such as a corporation, acting alone or (2) a group "associated in fact,"

though not a legal entity. *See* 18 U.S.C. § 1961(4); *United States v. Turkette*, 452 U.S. 576, 581-

82 (1981). An enterprise must contain an organizational structure as well as a common purpose

and existence independent of any racketeering activity. *See Turkette*, 452 U.S. at 582. To show

that an enterprise exists, a plaintiff must demonstrate: (1) an ongoing organization, formal or

informal; (2) that the various associates function as a continuing unit; and (3) the enterprise has

an existence separate and apart from the alleged pattern of racketeering activity. *Id.* at 583. This

first element requires a showing that "some sort of structure exists within the group for the

making of decisions, whether it be hierarchical or consensual." *United States v. Irizarry*, 341

F.3d 273 (quoting *United States v. Riccobene*, 709 F.2d 214, 222 (3d Cir. 1983)); *see also In re*

*Am. Investors Life Ins. Co. Annuity Mktg & Sales Practices Litig.*, Civ. A. No. 06-1712, 2006

U.S. Dist. LEXIS 35980, at *18-27 (E.D. Pa. June 2, 2006)(dismissing claim based on

association-in-fact enterprise because the "complaints do not permit an inference that any

organizational structure connected or controlled the various [enterprise members]").

Plaintiffs' enterprise allegations fail at this point because nowhere in their allegations regarding Defendants, doctors, hospitals, and other entities do they state how they are organized into a cohesive unit involved in group action. In their RICO case statement, Plaintiffs provide a list of seventy (70) doctors and hospitals who allegedly received illegal kickbacks from Defendants. *See* RICO Case Stmt., doc. no. 74 at ¶¶ 2(a)-(e), 6(a). However, as Plaintiffs declare in their RICO case statement, this list is only a "partial identification" of an enterprise. (*Id.* at ¶ 2). Also, they do not allege who is colluding with who to form this enterprise or the common purpose they are aiming to achieve. Plaintiffs do not specifically aver how each individual Defendant in this case, competing to sell its own products, colluded together. The doctors and hospitals listed as part of this alleged enterprise also compete with each other, thus, it is also unclear how they could be associated as a single group. Plaintiffs plead no facts suggesting such an association, and doing so would be near impossible. *See, e.g., Lockheed Martin Corp. v. Boeing Co.*, 357 F. Supp. 2d 1350, 1363 (M.D. Fla. 2005) (noting that competitors who compete for contracts "present[] a paradigmatic case of what is not an association-in-fact under RICO"). Plaintiffs simply make conclusory statements that Defendants colluded with physicians, hospitals, and other companies (ostensibly similar to Plaintiffs) that acted as Defendants' regional sales representatives.

Plaintiffs have not sufficiently pled organizational structure, and the Court cannot infer organizational activity or common purpose from a complaint that alleges an association-in-fact between such widely disparate entities and individuals. *See In re Am. Investors*, 2006 U.S. Dist. LEXIS at *19-20. In general, courts should reject association-in-fact enterprise allegations which are imprecise, vague, conclusory, and lack both clarity and any degree of specificity. *In re Ins.*

23

*Brokerage Antitrust Litigation*, Civ. A. No. 07-1663, 2007 WL 1062980 (D. N.J. April 5, 2007);

*see also Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640 (7th Cir. 1995) (holding that the

plaintiff's naming of a string of entities does not adequately allege an enterprise). Plaintiffs only

allege a loose association consisting of Defendants, doctors, hospitals, and other entities with no

hint as to the structure of the enterprise. Nowhere do Plaintiffs describe which Defendant or

which physician or hospital is in charge, nor do they describe the decision-making process. They

merely allege in their Amended Complaint and RICO Case Statement that Defendants made

allegedly illegal payments to a large group of disconnected physicians, hospitals, and other

medical institutions with the purpose of securing exclusive dealing agreements. Such lack of

clarity as to the organization of the enterprise is insufficient and grounds for dismissal. *See Smith*

*v. Jones, Gregg*, Civ. A. No. 08-365, 2008 WL 5129916, at *4-5 (W.D. Pa. Dec. 5, 2008)

(dismissing RICO claim where "no facts alleged as to the structure of the [enterprise], its

decision-making and management processes, or the roles and duties of each alleged participant).

At best, Plaintiffs allege that various members of the orthopedic industry in Western

Pennsylvania, Ohio, and West Virginia independently employed similar business models, that is

arranging exclusive dealing agreements with the Defendants. However, this allegation merely

indicates an industry practice rather than an enterprise. *See Ins. Brokerage*, 2007 WL 2892700,

at * 24 (observing that a "pernicious industry practice" does not amount to an enterprise).

Moreover, while the various associates of an enterprise must act as a continuing unit,

Plaintiffs plead that each doctor and institution "actively concealed and refused to disclose the

existence or extent of these illegal payments." Doc. no. 88 at ¶ 53. These payments were a

"tightly guarded secret." *Id.* at ¶ 52. Because each physician, hospital, and institution closely

guarded the knowledge of the payments, they could not work as a continuing unit towards achieving a common purpose, as required by *Turkette*. *Turkette*, 452 U.S. at 583. For the foregoing reasons, Plaintiffs have not sufficiently alleged an enterprise consisting of a group associated-in-fact.

### 2. Plaintiffs Equate Any Enterprise with the Alleged Racketeering Activity

The third element of *Turkette* requires that the alleged enterprise exist outside the alleged racketeering activity. *Id.* As stated above, Plaintiffs' alleged enterprise consists of a disparate group of Defendants, doctors, hospitals, and other entities that compete with each other and are not-associated in fact. While Plaintiffs make cursory notes that the physicians and hospitals involved perform "legitimate medical services," doc. no. 103 at 32, n.3, they fail to distinguish the enterprise from the alleged racketeering activity because they do not aver that each physician, hospital, and other entity listed performs these medical services as part of a full enterprise or group. Therefore, the only possible common purpose for the alleged enterprise in the instant case is to engage in alleged commercial bribery. As the commercial bribery is the alleged racketeering activity, *see* doc. no. 88 at ¶ 97, Plaintiffs fails to satisfy this element. *See McClure Enters. v. Fellerman*, Civ. A. No. 06353, 2007 WL 14558193, at * 4 (M.D. Pa. May 15, 2007).

Plaintiffs have not made sufficient averments in their Amended Complaint that would support the inference that the large and disparate group of doctors, hospitals, and orthopedic medical supply manufacturers somehow formed an organized enterprise.[6] This Court has given

---

[6] Plaintiffs' pleadings may also fail under the pre-*Twombly* standards as courts in other circuits have dismissed association-in-fact enterprise pleadings where the plaintiffs have failed to allege any organizational structure for the enterprise. *See Vandenbroeck v. CommonPoint Mortgage Co.*, 210 F.3d 696, 700 (6th Cir. 2000) (refusing to accept "vague allegations of a RICO enterprise made up of a string of participants . . . lacking any distinct existence and

Plaintiffs an opportunity to amend their complaint to aver the necessary specific and non-conclusory facts, but Plaintiffs have been unable to do so. For the foregoing reasons, Defendants Motions to Dismiss Plaintiffs' RICO counts pursuant to Federal Rule of Procedure 12(b)(6) are **GRANTED**.[7]

### D.    State Claims

Because both of Plaintiffs federal law claims have been dismissed, the Court must decide whether to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims. Section 1367 of Title 28 of the United States Code provides that a district court may exercise supplemental jurisdiction over state law claims if they form the same case and controversy as the federal claims. 28 U.S.C. § 1367(a). However, a district court may decline to exercise jurisdiction over the supplemental claims if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). While this rule appears to be permissive, the United States Court of Appeals for the Third Circuit has held that a "district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000).

---

structure"); *Simon v. Value Behavioral Health, Inc.*, 208 F.3d 1073, 1083 (9th Cir. 2000) (affirming dismissal where plaintiff "never alleged the existence of a system of authority that guided the operation of the enterprise").

[7] Plaintiffs also allege a RICO conspiracy claim under 18 U.S.C. § 1962(d). *See* doc. no. 103 -2 at 5  n.4. Plaintiffs argue that the Defendants' alleged violation of Section 1962(c) can serve as a basis for a Section 1962(d) conspiracy claim. *See id.* Because the Court finds insufficient allegations to sustain the Section 1962(c) claim, Plaintiffs' suggestion that the Section 1962(c) violation could be the object of a Section 1962(d) conspiracy claim likewise must fail.

26

Given the early stage of these proceedings, prior to significant discovery, economy concerns are not implicated, and it would not be unfair to decline to exercise jurisdiction over the state law claims.  The Court will decline to exercise its jurisdiction over the state law claims, and will dismiss said claims without prejudice.  Pursuant to 42 Pa. C.S.A. § 5103(b), Plaintiffs may pursue their claims in state court.

VI.     **CONCLUSION**

For the foregoing reasons, Defendants' Motions to Dismiss, doc. nos. 95-99, pursuant to Federal Rule of Civil Procedure 12(b)(6) are **GRANTED**, and the case is hereby dismissed with prejudice.  Plaintiff will not be granted leave to file a Third Complaint because amendment in this case would be futile.  *See Shane v. Fauver*, 213 F.3d 113, 116 (3d Cir. 2000) (noting that futility is a ground for denying leave to amend a complaint).

An appropriate order follows.

**SO ORDERED** this 18th day of March, 2009.

 s/ Arthur J. Schwab
Arthur J. Schwab
United States District Judge

cc:     All Registered ECF Counsel and Parties